CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
AUG 0 6 2010
JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| JANE M. CARPENTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 6:09-CV-00034 |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) By: Hon. Michael F. Urbanski |
| Commissioner of Social Security, | ) United States Magistrate Judge |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Plaintiff Jane M. Carpenter ("Carpenter") brought this action for review of the Commissioner of Social Security's ("Commissioner") decision denying her claim for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act"). On appeal, Carpenter argues that the ALJ erred by improperly evaluating her complaints of pain and by discounting the residual functional capacity assessment of her treating physician, Dr. Carmack. For the reasons outlined below, the undersigned finds that the Commissioner's decision is supported by substantial evidence. As such, it is **RECOMMENDED** that defendant's motion for summary judgment (Docket #20) be **GRANTED** and that the Commissioner's decision be affirmed.

I.

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Social Security Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "'Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [Administrative Law Judge] if they are supported by substantial evidence and were reached through application of the correct legal standard.'" Id. (alteration in original)

(quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must assure that his ultimate conclusions are legally correct." Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The "[d]etermination of eligibility for social security benefits involves a five-step inquiry." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). This inquiry asks whether the claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or

her past relevant work; and if not, (5) whether he or she can perform other work. Heckler v. Campbell, 461 U.S. 458, 460–62 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n. 1 (4th Cir. 2005) (citing 20 C.F.R. § 404.1520). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. § 404.1520(a)(4). Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"),[1] considering the claimant's age, education, work experience, and impairments, to perform alternative work that exists in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II.

Carpenter was born in 1955, (Administrative Record, hereinafter "R." 121), and graduated from high school. (R. 34.) Prior to the alleged onset date of November 2, 2005, Carpenter worked as an office manager, housing technician, data entry clerk, manager of a tax office, and tanning salon owner. (R. 21, 35-36, 144.) Her date last insured is March 31, 2008. (R. 131.) She filed an application for benefits on November 15, 2005. (R. 12.) Her application was rejected by the Commissioner initially and again upon reconsideration. At the administrative hearing initially scheduled for February 26, 2008, Carpenter was granted a

---

[1] RFC is a measurement of the most a claimant can do despite his limitations. See 20 C.F.R. § 404.1545(a). According to the Social Security Administration:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

Social Security Regulation (SSR) 96-8p. RFC is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain). See 20 C.F.R. § 404.1529(a).

continuance for thirty days so she could retain counsel. (R. 27.) The hearing was reconvened on May 29, 2008, at which time plaintiff testified and was represented by counsel. (R. 31-50.)

In an opinion issued on July 15, 2008, the ALJ found that Carpenter's degenerative disc disease, bulging discs at C4/5 and C6, fibromyalgia, iron deficiency anemia, vitamin B12 deficiency, irritable bowel syndrome, asthma, and borderline splenomegaly all qualify as severe impairments, pursuant to 20 C.F.R. § 404.1520(c). (R. 14.) The ALJ further found that Carpenter retained the RFC to perform light work, except that she is mildly restricted from climbing stairs and ladders, and she should not be exposed to dust and fumes because of her breathing problems. (R. 16.) The ALJ held that her ability to bend, kneel, crouch and crawl is reduced due to her fibromyalgia. (R. 16.) Finding Carpenter's RFC did not preclude her from performing her past relevant work,[2] the ALJ held that she is not disabled under the Act. (R. 21-22.) The Appeals Council denied Carpenter's request for review and this appeal followed. (R. 1-3.)

### III.

On appeal, Carpenter argues that the ALJ erred by improperly evaluating her complaints of pain and by finding her testimony concerning her pain and limitations not entirely credible. In 2005 she complained that her pain and spasms were so severe that sometimes just having her shirt touch her back caused them, and they caused her to scream in pain and require her to sleep sitting up. (R. 278-79.) Likewise, at the administrative hearing on May 28, 2008, Carpenter testified that the pain in her back "feels like someone is taking a, a knife and…they're cutting me." (R. 37.) Carpenter stated that she can sit only for 15 to 20 minutes at a time, after which

---

[2] At the administrative hearing, the Vocational Expert testified that Carpenter's past relevant work as a tanning salon owner is considered light work as customarily performed, and her work as a manager of a tax office, tax preparer, housing technician, office manager, and data entry clerk are all performed at the sedentary level. (R. 45-46.)

4

her back will "start knotting up and I have to get up and I go rub my back against the sofa or some rough surface" because "I just need to release those muscles." (R. 42.)

When faced with conflicting evidence in the record, it is the duty of the ALJ to fact-find and to resolve any inconsistencies between a claimant's alleged symptoms and her ability to work. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); accord Melvin v. Astrue, No. 606cv32, 2007 WL 1960600, at *1 (W.D. Va. July 5, 2007). Accordingly, the ALJ is not required to accept Carpenter's testimony that she is disabled by pain, and instead must determine through an examination of the objective medical record whether Carpenter has proven an underlying impairment that could reasonably be expected to produce the symptoms alleged. Craig v. Chater, 76 F.3d 585, 592-94 (4th Cir. 1996) (stating the objective medical evidence must corroborate "not just pain, or some pain, or pain of some kind or severity, but the pain the claimant alleges she suffers."). A claimant's statements alone are not enough to establish a physical or mental impairment. 20 C.F.R. § 404.1528(a). "[S]ubjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." Craig, 76 F.3d at 591 (citing Mickles v. Shalala, 29 F.3d 918, 922 (4th Cir. 1994)); see also 20 C.F.R. § 404.1529(b). Subjective evidence cannot take precedence over objective medical evidence or the lack thereof. Craig, 76 F.3d at 592 (quoting Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986)). The ALJ must determine whether Carpenter's testimony about her symptoms is credible in light of the entire record. Credibility determinations are in the province of the ALJ, and courts normally ought not interfere with those determinations. See Hatcher v. Sec'y of Health & Human Servs., 898 F.2d 21, 23 (4th Cir. 1989); Melvin, 2007 WL 1960600, at *1; Social Security Ruling 95-5p.

The objective medical evidence does not support the level of pain and degree of limitation Carpenter claims. Carpenter's back pain has evolved from complaints of mid-thoracic pain with no radicular components in 2005 (see R. 213) to low back pain in early 2007 (see R. 375) to neck and shoulder pain in mid-2007 (see R. 384). Examinations by two consulting physicians were normal. (R. 291.) The objective findings by her treating physicians have been unremarkable and there are times during the relevant period where she presented to her doctor with numerous complaints but did not mention back pain.

According to the records, an MRI taken in 2000 was normal. (R. 213.) At an examination in April, 2005, Dr. Snyder noted Carpenter sat with her shoulders stooped forward and had a physiologic kyphotic[3] curve, which he stated is not uncommon. (R. 213.) Carpenter had good range of motion in the neck, no tenderness along the neck or over the levator scapulae or trapezii, and tenderness over the paravertebral muscles at the area of maximum convexity of the kyphosis, which correlated with the area of marked pain. (R. 213.) Dr. Snyder believed she had created a chronic strain pattern with cording of the paravertebral muscles and thought she would benefit from a spine stabilization rehab approach and posture conditioning program. (R. 213.) An MRI taken on June 7, 2005 showed mild mid-thoracic degenerative disc disease not appreciably changed since November, 2001. (R. 212.) After reviewing this report, Dr. Snyder recommended an exercise program. (R. 211.) In July, 2005, Carpenter presented to her primary care physician, Dr. Carmack, continuing to complain of muscular back pain and spasms. (R. 280.) A back exam showed muscle pain and spasm in the paraspinal musculature, mid to

---

[3] Kyphotic is defined as affected with or pertaining to kyphosis, which is abnormally increased convexity in the curvature of the thoracic spine as viewed from the side. Dorland's Illustrated Medical Dictionary 986 (30th ed. 2003).

lower back. (R. 280.) Her prescription for Flexeril was increased, and she was given Neurotonin in addition to Daypro. (R. 280.)

According to the record, Carpenter did not see another physician until October, at which time she reported to Dr. Carmack that she was feeling much better, an "8 out of 10 with 10 being normal." (R. 276.) She presented again in December, 2005 complaining of mid-back pain, and Dr. Carmack continued her on her present medication without making any findings with respect to her back. (R. 275.) In February, 2006, Carpenter complained her medications were not working and wanted to try something new; she was prescribed Ultram. (R. 272.)

She saw Dr. Carmack again in March, April, and May of 2006 "complaining of all sorts of things," (R. 257), but she did not mention her back. A consultative examination performed by Dr. Young on July 29, 2006 showed normal range of motion in the spine and joints. (R. 239.) Carpenter did not mention her back pain to Dr. Carmack again until December, 2006, when she presented with a chief complaint of abdominal pain but also brought with her a list of complaints which included chronic back pain. (R. 393.) No treatment for this pain was discussed. (R. 393.)

In January, 2007, Carpenter once again complained to Dr. Carmack of back pain, this time of low back pain with radiation down her left leg. (R. 375.) A back exam showed some tenderness in the lower paraspinal musculature with SI joint discomfort. (R. 375.) She was given an injection of Depomedrol and a refill of her Ultram and Flexeril. (R. 375.) Notably, she did not complain of radiating pain at her examination by consulting physician Dr. Dobyns, which was held less than one week later. (R. 291.) Examination showed some tenderness in the thoracic region but "[o]therwise, relatively nontender as you go down the spine. . . . There is no tenderness and no spasm in the lower back. . . . Range of motion is normal." (R. 291.)

While she did not mention back pain when she saw Dr. Carmack in March, 2007, she wrote a letter to the Social Security Administration on March 13, 2007, stating the pain from her back had moved into her neck and she was having spasms in her shoulders. (R. 63.) She explained, "I think an old injury from 1978 is acting up in my lower back – sometimes I go to stand up and fall back down – it feels like someone is using a knife in my lower back." (R. 63.)

Carpenter's primary complaint with respect to her back in May, 2007 was of neck and shoulder pain, with numbness in her left hand. (R. 384.) Dr. Carmack noted she had "signs consistent with a C-6 left sided radiculopathy" but gave no explanation of these signs. (R. 384.) As far as treatment, plaintiff stated she "wanted to try something simple first" and was prescribed a Medrol Dosepak and Lortab for pain. (R. 384.) On June 7, 2007 she stated she was having problems with her neck and arms and complained of numbness in her left hand, although her chief complaint concerned onset of menopausal symptoms. (R. 383.) There were no findings regarding her back upon examination, other than the fact that she continues to have numbness in her fourth finger of her left hand. (R. 383.) An MRI taken on June 12, 2007 revealed at C5/6 broad posterior disc/osteophyte complex with circumferential bulging and slight effacement of the cord. (R. 381.) There was also a minimal circumferential bulge at C4. (R. 381.) Carpenter was referred to a neurosurgeon (R. 194, 383), but there are no such treatment records in evidence.

Less than six months later, she presented to Forest Family Physicians with a right ankle injury after falling off a motorcycle. (R. 377.) She did not complain of back pain again until January, 2008, at which time she complained of "lots of aches and pains" mentioning her knees, hips, and both thumbs, and she was given a shot. She also mentioned C5/6 radiculopathy that

8

was "flaring up". (R. 376.) Notes reveal she "does have some radicular symptoms in her left arm and hand" but there are no other findings noted. (R. 376.)

Carpenter has been treated conservatively for her back pain since she began complaining of pain in approximately 2001 (R. 281). Treatment prior to 2005 included physical therapy, chiropractic therapy, acupuncture, and holistic therapy. (R. 213.) In 2004 she was advised by Dr. Hinkle at Forest Family Physicians to continue with acupuncture. (R. 282.) In April, 2005, Carpenter saw Dr. Snyder for a "second opinion" after her other therapies failed. He recommended a spine stabilization rehab approach and posture conditioning program. (R. 213.) She appeared for an initial physical therapy evaluation on April 29, 2005 (R. 219-31) but notes from her second appointment state that she was unable to tolerate even the most benign interventions and no therapy was administered. (R. 217.) She cancelled the third appointment and phoned Dr. Snyder to say she was not going to return to physical therapy until she had an MRI, because it was financially burdensome and she did not feel it was helping. (R. 213, 216.) She was subsequently discharged from therapy. (R. 214.) After reviewing an MRI report that showed no appreciable changes to her mild degenerative disc disease, Dr. Snyder noted at a follow up visit, "[s]he really needs to get into an exercise program. . . . This and exercise walking will probably bring about marked resolution of her symptomatology . . . ." (R. 211.)

Besides acupuncture and physical therapy, she has been treated with medication. Doctors have prescribed at various times Ultracet, Flexeril, Neurotonin, Ultram and Daypro, and she was advised to consider treating her back pain with heat in March, 2005. (R. 281.) In April, 2005, notes reveal Carpenter was prescribed Lortab because she was taking too many Ultracet, and she was advised to use them sparingly. (R. 281.) Three days later she called asking for more Lortab; she had gone through 20 Lortab in three days. (R. 278, 281.) Dr. Hinkle prescribed MS Contin

9

and advised she continue with Daypro and Flexeril. (R. 278.) She has also received Hydrocodone for pain (R. 280) and an injection of Depomedrol. (R. 375.)

While records state she was referred to a specialist in 2007, there are no records from any treatment by this neurosurgeon, and Carpenter failed to list him on her updated list of medical treatment. (R. 196; see also R. 383.) Carpenter has been treated for her back pain almost exclusively by her primary care physician. No doctor has opined that Carpenter's condition requires surgical intervention. The objective evidence simply does not support Carpenter's alleged level of pain and limitation.

Nor does the medical evidence support her claimed limitations with respect to the myriad other complaints she has raised. For example, Carpenter testified that she goes "from constipation to diarrhea" as a result of her irritable bowel syndrome, which causes her to need frequent bathroom breaks throughout the day. (R. 43.) However, evidence does not suggest she needs frequent bathroom breaks. Although she has a past history of irritable bowel syndrome and she reported experiencing persistent symptomatic diarrhea at an appointment with Dr. MacNeill in April, 2007, she has had no consistent treatment for diarrhea.

Following complaints of abdominal pain and swelling, examination revealed positive bowel sounds, her abdomen was soft, and Dr. Carmack noted a "little bit of tenderness in the epigastric region," although there was no appreciable mass. (R. 257, 275.) She declined a gastrointestinal workup for monetary reasons (R. 275, 276), but a CT scan of her abdomen in May, 2006 was essentially normal, showing only scattered colonic diverticula without a finding of diverticulitis or other inflammation. (R. 259.) By December, 2006, her financial situation had changed and she returned to see Dr. Carmack after having "disappeared" from follow-up, and reported she wanted a work-up. (R. 393.) Another CT of the abdomen in December, 2006

showed low grade diverticulitis and borderline splenomegaly. (R. 391-92; see also R. 343.) She complained of fatigue and was noted to have low levels of iron and vitamin B12. Carpenter was referred to a specialist, Dr. MacNeill, for her anemia, B12 deficiency, and complaints of abdominal pain. She was treated with B12 shots and iron pills, as well as IV iron. A thyroid test was normal. (R. 256.) Dr. MacNeill noted she "doesn't seem to have an overt live disease," and "[a]s far as her GI tract she has really not had a lot of symptoms." (R. 344.) She stated her abdomen was not bothering her at an appointment in February, 2007 (R. 340), and she reported to Dr. Carmack in March that she was starting to feel better. (R. 387.) She had a colonoscopy in February, 2007, which was essentially normal but was terminated before completion due to poor prep. (R. 328.) She was admitted to the intensive care unit after complaining of extreme pain following the procedure, but x-rays revealed no evidence of perforation and her condition improved dramatically after expelling flatus. (R. 323, 326, 334.) Dr. MacNeill noted in April that her iron deficiency was responding nicely to IV iron (R. 337) and in March, 2007, Dr. Carmack noted her anemia was "clearly improved." (R. 385.) Contrary to plaintiff's assertions, the ALJ did address her complaints of fatigue and found they were unsupported by the medical evidence given the fact that her anemia was responding to treatment, but even so, he noted that the light work restriction accommodated this symptom. (R. 21.)

Plaintiff testified that she is asthmatic and cannot walk for more than 15 or 20 minutes because she would "probably lose [her] air." (R. 40.) There are references in the record to complaints of trouble breathing upon exertion, but notes reveal her oxygen saturation was "98% on room air" (R. 269) and examinations consistently reveal her lungs are clear. Minimal information was obtained in a stress test on April 14, 2006 because Carpenter had poor exercise tolerance, but it was noted to be negative. (R. 263, 265.) A Dobutamine Stress Echocardiogram

in May, 2008 was also normal. (R. 396.) In May, 2006, she requested a prescription for oxygen for an upcoming trip to Washington, D.C., but this request was declined after her oxygen saturation was 98% sitting in the lab and 98% walking outside around the building in 82 degree heat. (R. 256.) She was advised to take frequent breaks and keep hydrated. (R. 256.)

There are repeated references in the medical notes to Carpenter being a "complicated woman." (R. 269, 383, 393.) Despite claims she only has three to four good days per week, plaintiff admitted at the administrative hearing that her fibromyalgia flare-ups have not been severe. (R. 41, 43.) She cares for her dog and takes it out on a leash two to three times per day (R. 153, 155), prepares meals (R. 154), does some laundry, dusting, and washes dishes (R. 39, 154), shops (R. 155), and performs secretarial volunteer work for the veterans group Rolling Thunder twice per month (R. 156). She told Dr. Young that on a good day, she can perform all activities of daily living, including cooking and cleaning. (R. 238.) She took a trip to Washington, D.C. in 2006 and in November, 2007, she received a right distal fibular fracture after falling off a motorcycle. (R. 378.) She testified that her medications help control her pain and although she says they cause her not to function well, there is no documentation of side effects in the record. (R. 38, 44.) Additionally, the RFC determinations made by two consultative examining physicians and two reviewing state agency physicians contradict her stated limitations.

Based on this record, the court finds no reason to disturb the ALJ's credibility assessment. See Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). Allegations of pain and other subjective symptoms, without more, are insufficient to establish

disability. Craig, 76 F.3d at 592. The ALJ appropriately accommodated her documented impairments in his RFC determination, finding she was restricted to light work with limited climbing, bending, kneeling, crouching and crawling, and was precluded from exposure to dust and fumes. Substantial evidence supports this determination.

## IV.

Carpenter argues that the ALJ erred by discounting the opinion of her treating physician, Dr. Carmack, regarding her ability to work. Specifically, Carpenter points to a note from Dr. Carmack in January, 2007, that she was "clearly unemployable in her present situation. I don't look for that to change anytime soon." (R. 375.) On January 24, 2008, Dr. Carmack filled out a Medical Source Statement of Ability to Do Work-Related Activities (Physical) stating that Carpenter could occasionally lift and carry up to ten pounds and sit, stand, and walk for a total of only six hours[4] in an eight hour workday. (R. 368.) Dr. Carmack did not provide information regarding what activity was being performed for the rest of the workday if the total does not equal eight hours. (R. 368.) Also of note, he indicated she could shop, travel without a companion, ambulate without assistance, prepare meals, and care for her personal hygiene. (R. 372.) He stated Carpenter is very limited in her use of her upper body and arms, but provided no justification for this statement, and he opined these limitations have been present since 2001. (R. 372.)

A treating physician's opinion is to be given controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001);

---

[4] It is worth noting that Dr. Carmack initially marked boxes on the form indicating Carpenter could sit, stand and walk for three hours each, totaling nine hours. (R. 368.) He then crossed out these responses and checked the boxes indicating she could perform these tasks for two hours each.

13

20 C.F.R. § 404.1527(d)(2), 416.927(d)(2); Social Security Ruling 96-2p. The ALJ is to consider a number of factors, which include whether the physician has examined the applicant, the existence of an ongoing physician-patient relationship, the diagnostic and clinical support for the opinion, the opinion's consistency with the record, and whether the physician is a specialist. 20 C.F.R. §§ 404.1527(d), 416.927(d). A treating physician's opinion cannot be rejected absent "persuasive contrary evidence," and the ALJ must provide his reasons for giving a treating physician's opinion certain weight or explain why he discounted a physician's opinion. Mastro, 270 F.3d at 178.

The ALJ's determination not to adopt Dr. Carmack's RFC assessment, which would preclude Carpenter from all work, is explained thoroughly in his decision and is supported amply by the evidence. (R. 20.) Dr. Carmack is Carpenter's primary care physician, not a specialist, who, according to the record, treated her a number of times from 2005 to 2008. On the whole, his findings are vague and unremarkable and do not support his determination that she is unable to work a full eight-hour day. Her anemia and B12 deficiency improved with treatment, her oxygen levels were normal, and her lungs were consistently noted to be clear. Dr. Carmack's treatment for Carpenter's pain and back spasms was limited to medication, and he did not feel the need to refer her to a specialist until June of 2007, although there is no evidence she followed up on that referral. During the relevant period, there are gaps in her treatment by Dr. Carmack where she did not complain of back pain but presented with other complaints. Dr. Carmack references Carpenter's cervical disc problem on his RFC form, but his findings relating to this impairment are minimal. When she first complained about neck pain in May, 2007, Dr. Carmack noted only that "[s]he continues to have numbness in her 4th finger left hand" and "[s]he has signs consistent with a C-6 left sided radiculopathy." (R. 384.) Five months later, she

fell off a motorcycle and "was able to get up and lifted the motorcycle up off her and rode the motorcycle home." (R. 377.) Office notes from orthopaedist, Dr. Dodd, state she "was immediately able to stand and walked the bike back." (R. 361.) In January, 2008, just prior to filling out her disability forms, Dr. Carmack noted only that Carpenter "[d]oes have some radicular symptoms in her left arm and hand." (R. 376.) When Carpenter presented on January 24, 2008 with "ten crazy pages" for Dr. Carmack to fill out, he stated she has cervical stenosis with radicular symptoms and chronic pain but made no other findings, other than a note that reads she "deserves disability. She is having lots of trouble." (R. 374.)

Dr. Carmack's RFC determination is unsupported by his clinical findings and is inconsistent with the record as a whole, as noted in detail above. See supra § III. Four other physicians found Carpenter is able to perform at least light work. Carpenter was examined by Dr. Young on July 29, 2006. She noted plaintiff's gait was normal. She was able to perform the finger-nose test and heel-to-knee test and had a negative Romberg test. (R. 239.) She had a normal range of motion in the cervical spine, dorsolumbar spine, shoulder joints, elbows, and hip joints, and normal flexion and extension in the knee joints, ankle joints, wrist joints, hand and fingers. (R. 239.) Strength was 5/5 bilaterally in the upper and lower extremities. (R. 239.) Her diagnoses included fibromyalgia, back spasms, increased fatigue. (R. 239.) Dr. Young noted she had no limitations as regards sitting and could walk or stand six hours in an eight hour workday. (R. 240.) She could occasionally carry 50 pounds but frequently carry 10 to 20 pounds, and had no limitations as to bending, stooping, crouching, reaching, handling, feeling, or grasping. (R. 240.)

On August 3, 2006, state agency physician James Wickham, M.D., reviewed her records and found she could lift 50 pounds occasionally, 25 pounds frequently, stand and/or walk for

about 6 hours in an eight hour workday and sit for about 6 hours. (R. 243.) She had no other limitations.

Dr. Dobyns performed a consultative examination of Carpenter on January 16, 2007 and noted she was in no acute distress and moved easily onto the examining table. (R. 291.) He stated she had only slight tenderness to the strap musculature in the low cervical region, some tenderness in the thoracic trigger areas, and otherwise, relatively no tenderness as you go down the spine. (R. 291.) Her range of motion was normal, as was the examination of her extremities. (R. 291.) She mentioned no problem with radiation of pain into the legs. (R. 292.) He diagnosed her with thoracic pain with minimal physiological pathology and fibromyalgia, as well as anemia and splenomegaly and shortness of breath. (R. 292.) Dr. Dobyns noted she could work a full eight hour workday with mild restrictions in climbing stairs and ladders and environmental restrictions due to her breathing issue, as well as light reduction in stooping, bending, kneeling, crouching and crawling due to fibromyalgia. (R. 292.)

Following a records review on January 24, 2007, state agency physician Michael Hartman, M.D., found that Carpenter could occasionally lift 20 pounds and frequently lift 10 pounds, and that she could stand and/or walk for 6 hours and sit for 6 hours in a workday. (R. 298.) She was to avoid any exposure to fumes, odors, dusts, gases or poor ventilation. (R. 298.)

The ALJ's decision to credit the opinions of the state agency physicians and the consulting examining physicians over the Medical Source Statement of Dr. Carmack is supported by the record. See Smith v. Schweiker, 795 F.2d 343, 346 (4th Cir. 1986) ("the testimony of a non-examining physician can be relied upon when it is consistent with the record"

(quoting Kyle v. Cohen, 449 F.2d 489, 492 (4th Cir. 1971))). As such, the undersigned **RECOMMENDS** that the Commissioner's decision be **AFFIRMED**.

V.

At the end of the day, it is not the province of the court to make a disability determination. It is the court's role to determine whether the Commissioner's decision is supported by substantial evidence, and, in this case, substantial evidence supports the ALJ's decision. In recommending that the final decision of the Commissioner be affirmed, the undersigned does not suggest that Carpenter is free from pain throughout her body. Careful review of the medical records compels the conclusion that Carpenter has not met her burden of establishing that she is totally disabled from all forms of substantial gainful employment. The ALJ properly considered all of the subjective and objective factors in adjudicating plaintiff's claim for benefits. It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence.

The Clerk is directed to transmit the record in this case to the Honorable Norman K. Moon, United States District Judge. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 637(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The Clerk is also directed to send a copy of this Report and Recommendation to all counsel of record.

Entered: August 6, 2010.

/s/ Michael F. Urbanski

Michael F. Urbanski
United States Magistrate Judge